Shirley BIVINS et al., Plaintiffs,

v.

BIBB COUNTY BOARD OF EDUCATION and Orphanage for Bibb County, et al., Defendants.

Civ. A. No. 1926.

United States District Court,
M. D. Georgia,
Macon Division.

Sept. 1, 1971.

Thomas M. Jackson, Macon, Ga., Jack Greenburg, Norman Chachkin, New York City, for plaintiffs.

Frank C. Jones, Wallace Miller, Jr., W. Warren Plowden, Jr., Jones, Cork, Miller & Benton, Macon, Ga., for defendants.

## MEMORANDUM OPINION

BOOTLE, Chief Judge:

This case is now before the court on plaintiff's motion for further relief filed on July 16 of this year. On July 19, this court entered an order calling upon the defendants to file their plan of operation for the coming year, including what changes, in the opinion of the defendants, should be made as to any details or provisions of the plan now in effect in light of any recent court decisions. The order called attention to the fact that the plan now in operation was mandated by the Court of Appeals.

The defendants have filed their response, including a proposed plan which shows that if any attempt is required to be made to achieve approximate racial balance in the elementary grades it can be done only "at great expense and in many cases great inconvenience to the children and parents involved."

The plaintiffs then filed their objections expressing their disagreement with the proposed plan prepared by the defendants and praying that the court substitute therefor one of the two other plans presented to the defendants by a task force, or a new plan entirely "which does not discriminate against black students, parents, teachers and staff personnel by the arbitrary closing of for-merly black schools and the disproportionate busing of black children."

The parties have been heard all day and it is time for a decision. Since school opens in two weeks from today time is of the essence and the court's findings of fact and conclusions of law and the nature of the order to be entered and its substance will be stated from the bench.

When this case was before the Court of Appeals on December 1, 1969, Singleton v. Jackson Municipal Separate School Dist. 5 Cir., 419 F.2d 1211, the court said at page 1221:

"This is a freedom of choice system on which a special course transfer provision has been superimposed."

And then it said further:

"It is sufficient to say that the district court here [and, of course, they meant the Board of Education] has employed bold and imaginative innovations in its plan which have already resulted in substantial desegregation which approaches a unitary system. We reverse and remand for compliance with the requirements of Alexander v. Holmes County [Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19] and the other provisions and conditions of this order."

After that appellate decision the defendant Board of Education prepared the plan now in effect. This court refused to order its implementation, writing, on January 21, 1970, a memorandum opinion in which it undertook to extol the virtues and proclaim the adequacy of freedom of choice, and refusing to order school children either zoned or bused. This court then thought and still thinks that when school facilities are truly equal, when faculties, administrative staff, extracurricular activities and transportation all are fully desegregated, and when every child is genuinely free to attend any school it wishes to attend, regardless of race or economic status in life there simply is no discrimination.

The case again went to the Court of Appeals and on February 5, 1970, in

Bivins v. Bibb County Board of Education, 424 F.2d 97, 99, the majority opinion says:

"The district court is directed to enter its order approving the plans proposed by the respective appellee School Boards and directing the appellee Boards to put the plans into effect by or before February 16, 1970."

The court referred to the "plans" and the "Boards" in the plural because they were considering both the Bibb plan and the Houston County plan. And then the court said further:

"The district court is directed to schedule expedited hearings for such modifications to the plans as may be necessary to correct unworkable elements in the plans and to allow the parties an opportunity to suggest improvements in the plans in the light of the actual workings of the plans to the end that student bodies will be more effectively desegregated than they were under the freedom-of-choice method. The hearings, however, shall not delay the full implementation of the plans by February 16, 1970."

One of the three judges dissented, and here is what he said:

"I believe these cases were correctly decided in the District Court and that the Constitutional rights of the school children in these districts were preserved by that action. Instead of embroiling these children in further uproar and disruption I would pronounce a 'well done' on Bibb and Houston and thus encourage other districts to go and do likewise. The record in these cases shows that no child is being excluded from any school by reason of race. It is a rare district that can point to the fact that twenty-five per cent of its Negro students are enrolled in formerly all-white schools, as in Bibb. The same may be said of the twenty per cent in Houston. There are no more all-black schools, for the facilities and staffs have been integrated and entire classes from the formerly all-white schools are being taught in the formerly all-black schools. There is no showing whatever that the status of any school is caused by racial discrimination. So, what the majority seems to be doing here is to continue to strive for racial balance. [They had not said so specifically.] Nor is this justified on the argument that it is necessary for the eradication of discrimination. When every child is genuinely free to attend any school it wishes to attend, regardless of race or economic status in life, there simply is no discrimination. Some of these days, the Courts are going to have to recognize this fact if they are to free themselves of their tragic failures in the role of school administrators and get back to their primary function."

Of course, we are bound by the law as written by the majority. These excerpts are quoted to see just where we stand. This court was directed to approve a certain specifically designated plan and to direct the defendant to put it into effect. All of this has been faithfully done by this court and by the defendants. This court was ordered further to provide hearings to allow the parties an opportunity to suggest improvements in the plan in the light of the actual workings of the plan to the end that student bodies will be "more effectively desegregated than they were under the freedom-of-choice method." The pending motion is plaintiffs' first request for such a hearing.

There is a noticeable disparity between the goal of the pending motion: "to achieve the greatest possible degree of actual desegregation" and the "end" proposed by the Court of Appeals: "that student bodies will be more effectively desegregated than they were under the freedom-of-choice method."

It is important to see what has been accomplished under the plan now in effect, the plan prepared by the defendants on January 12, 1970, and approved and mandated by the Court of Appeals February 5, 1970, and placed in effect as to elementary schools on February 16,

1970, and as to Junior and Senior High Schools on September 1, 1970. The plan now in effect showed the then current enrollment at each school by race and the prospective enrollment by race sought to be accomplished for each school under the plan. It showed on its face that under this neighborhood zone concept there would probably be a few schools with either all-black or all-white student bodies. This did not prevent its approval by the Court of Appeals, and the workings of the plan show that those prospective enrollment figures were fairly accurate.

Under the plan now in effect this entire school system, which is county-wide, including all public schools in the City of Macon and County of Bibb, originally 15 Junior and Senior High Schools and 43 elementary schools, a total of 58, was completely reconstituted just eighteen months ago, reorganized, rezoned, and replanned, as the Court of Appeals told us to do it, all in a bona fide effort to give to the plaintiffs all of the relief to which they were entitled, to bring about complete desegregation throughout the system, to convert entirely from a dual to a unitary system. That was undertaken by establishing for all Junior and Senior High Schools three complexes with an appropriate nondiscriminatory feeder system for each complex, the vocational school constituting a fourth complex, and by establishing rigid attendance zones for each of the 42 elementary schools, one being closed. These zone lines were drawn according to the neighborhood school concept except that they were also drawn so as "to achieve the greatest possible degree of actual desegregation," Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554, April 20, 1971, Part V (2), "taking into account the practicalities of the situation" Davis v. Board of School Commrs., 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577, April 20, 1971, and without undue, unwarranted and impracticable gerrymandering for that purpose. All schools in the system were completely desegregated as to students, faculty, administrative staff, transportation, and extracurricular activities, and, to control the long future, construction and site selection was retained under the jurisdiction of the court. Freedom of choice through majority to minority transfers was retained.

There are 12 grades in this system, 1 through 7 elementary and 8 through 12 Junior High and Senior High. As to the top five grades, Junior High and Senior High, there is no complaint. The motion says: "The secondary school complexes for the most part reflect a black-white student ratio representative of the county school population." Thus every pupil and student in the system will for the last five years of the twelve year school period be forced to attend, irrespective of choice, schools unquestionably completely desegregated, and admittedly so. At issue here is only the effectiveness, validity and sufficiency of the desegregation of the elementary schools. The question is whether the defendants successfully converted from a dual to a unitary system on February 16, 1970, eighteen months ago. The defendants thought they did; this court thought they did, and apparently the Court of Appeals thought they did. The school plan for desegregation then placed in effect and now in operation was prepared by the defendants not as a stopgap measure but in response to a directive from the Court of Appeals to comply "with the requirements of Alexander v. Holmes County and the other provisions and conditions of this order." Singleton v. Jackson Municipal Separate School Dist., 419 F.2d 1211, 1221 (1970). It was Alexander v. Holmes County Bd. of Ed., 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19, 21, which had already held that the standard of "all deliberate speed" was no longer permissible and that "the obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools." It was obviously for the purpose of converting completely from a segregated dual system to a desegregated unitary system that the Court of Ap-

peals chose the plan now in effect, over one prepared by the plaintiffs, and over another prepared by H.E.W., and ordered its implementation.

Considerable busing now is being done under the present plan. The figures show under the evidence in this case that the defendants are busing 4,764 elementary students, and the projected increase under the conjectural plan is 5,786; the total one way mileage of transportation is now 4,484 miles each day and the conjectural plan would increase that by 639.44 miles each day. The conjectural plan calls for transportation for as great a length as 9 miles each way with travel time of as much as 25 minutes each way. The annual transportation expense, less fixed charges, is now $430,314.04. The projected increase under the conjectural plan is $275,191.00, which would contemplate use of the present fleet of buses and does not include depreciation as an item of this cost.

The plaintiffs' motion was probably inspired by the recent opinion of the Supreme Court in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554, decided April 20, 1971. Plaintiffs' reliance upon that case insofar as the situation in Bibb County is concerned is, we think, misplaced. In *Swann*, the Court was dealing with a school board which "had totally defaulted in its acknowledged duty to come forward with an acceptable plan of its own." *Swann*, Part V (1). The trial court, therefore, had to devise a plan and he decided that busing was necessary under the facts of that particular case. The Court of Appeals, fearing "that the pairing and grouping of elementary schools [with its consequent busing] would place an unreasonable burden on the board and the system's pupils", held that the trial court had erred in so ordering. *Swann*, Part I. The Supreme Court then held that the Court of Appeals erred in reversing the District Court and announced the wholesome principle that it, the Supreme Court, "must of necessity rely to a large extent * * *

on the informed judgment of the district courts in the first instance and on courts of appeals." Swann, Part V (3).

Swann's holding in regard to busing is epitomized in this sentence:

"In these circumstances, we find no basis for holding that the local school authorities may not be required to employ bus transportation as one tool of school desegregation" *Swann*, Part V (4);

plus this:

"An objection to transportation of students may have validity when the time or distance of travel is so great as to risk either the health of the children or significantly impinge on the educational process. District courts must weight the soundness of any transportation plan. * * * It hardly needs stating that the limits on time of travel will vary with many factors, but probably with none more than the age of the students. The reconciliation of competing values in a desegregation case is, of course, a difficult task with many sensitive facets. * * * " *Swann*, Part V (4).

Obviously a holding by the Supreme Court that under certain circumstances, for instance where there is an uncooperative Board of Education—not this case at all—and where no desegregation has been accomplished—not this case at all—a District Court may be justified in ordering busing, is by no means a holding that a District Court is required to order busing, or even that he would be justified in doing so unnecessarily. Indeed, *Swann* said, in Part V (1):

"If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole."

■ On the facts in this case and in a "reconciliation of competing values" *Swann*, Part V (4), and in a "balancing of the individual and collective interests", *Swann*, Part III, this court finds that any requirements of additional busing in this case would be unreasonable, impractical and unwarranted because of (1) the distances to be traveled, (2) the inconvenience to the children involved, (3) the age of the students from grades 1 through 5 and on through grade 7, particularly the lower grades, (4) the impingement on the educational process as to the children in the lower grades, (5) the expense involved, and (6) the lack of funds for the purpose.

Further, on the facts, this court finds that neither busing nor pairing (which is another name for busing when the schools to be paired are any substantial distance apart) is necessary. The Constitution speaks of "equal protection of the law", not of "racial balance" or "racial percentages". *Swann* recognizes that: "The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." *Swann*, Part V (1). And *Swann* says further: "The existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system which still practices segregation by law." *Swann*, Part V (2).

Under all of the evidence this Court finds as a fact and concludes as a matter of law that this school system is a unitary system, legally desegregated, and that it has been such certainly since it fully implemented its present Court of Appeals mandated plan on February 16, 1970 as to the elementary schools and on September 1, 1970 as to the Junior and Senior High Schools. The real vice in state-imposed school segregation was that it denied the student, because of his race, the right to attend the school he wished to attend. That was it. The dual system was the means of accomplishing that denial. The vice of the

dual system consisted in having separate schools for the races and separate controlling attendance zones for the races. All of these vices have been removed in the Bibb County system and they have been removed, in the modern idiom, "root and branch" and no "vestige" remains. All racial barriers have been removed from the Bibb County School system and from every school in it. The schoolhouse doors are open to all, completely without discrimination. Housing patterns are not vestiges of state-imposed school segregation. Similar housing patterns exist throughout the nation in areas where school segregation is said to be *de facto* rather than *de jure*. The relatively small amount of racial imbalance existing in the Bibb County Schools today is not segregation nor is it a "vestige" of segregation. The demography of other sections of this nation teaches us that this imbalance would be here today in Bibb County if there never had been state-imposed segregation. The School Board is by no stretch of the imagination responsible for housing patterns. The Congress has addressed itself to that problem and has enacted laws binding upon property owners and real estate dealers and agents looking toward the elimination of discrimination in that area.

■ The defendants, having already desegregated this school system, are not "constitutionally required to make year-by-year adjustments of the racial composition of student bodies." *Swann*, Part VI.

*Swann*, Part VI says:

"It does not follow that the communities served by such systems will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system.

This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary."

And that makes a lot of sense. It is abundantly clear that the School Board cannot control shifting populations. Boards of Education cannot order that people continue living where they now live. We do not overlook the fact that in *Swann* and its companion case, Davis v. Board of School Commrs., 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577, the Court states that "the district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation" *Swann*, Part V (2), "taking into account the practicalities of the situation", *Davis*, and will "thus necessarily be concerned with the elimination of one-race schools." Swann, Part V (2). This court and these school authorities fully complied with this language more than a year before it was written and have fully discharged their duties in this regard. The "practicalities" must be observed and there must be, in the words of *Swann*, Part III, "a balancing of the individual and collective interests", and there must also be, in the words of *Swann*, Part V (4), "the reconciliation of competing values."

As previously stated, the Junior and Senior High Schools are admittedly fully desegregated. And it cannot be gainsaid that with respect to the elementary schools rigid attendance zone lines were drawn so as "to achieve the greatest possible degree of actual desegregation" of student bodies "taking into account the practicalities of the situation". All reasonably permissible gerrymandering was used for that purpose. And, of course,

all other facets of school operations for the entire system were completely desegregated, including faculties, administrative staffs, transportation, and extracurricular activities. Site selection and construction remains under the control of the court and freedom of choice through majority to minority transfers prevails.

The defendants have clearly and convincingly shown their concern as to the elimination of one-race schools. There are no more one-race schools in this system. I refuse to agree that the faculty is no part of the school. And schools with student bodies of one race have already been reduced from 58 to 7.

Accordingly, counsel for the defendants may prepare an order and submit it to counsel for the plaintiffs for approval as to form, ordering that the defendants shall abide by the previous decrees of this court and continue to operate the Bibb County Schools under the plan now in effect, adding to it the one specific amendment required by *Swann*, and that is that the present majority to minority transfer provision is amended so as to provide that any student choosing to exercise that option to transfer shall be furnished free transportation to the school he or she chooses to attend and that the transfer request shall not be denied on the basis of over-crowding or lack of space in the school to which the student seeks to transfer, and ordering the defendants to disseminate this amended provision by available news media so that the community may be alerted to this amendment.

The order will grant permission to make the two minor changes with respect to the operation of the secondary schools as outlined in paragraph 3 of the response. I understand there is no objection to these two minor changes.

I have carefully considered all of the other requests in the motion and they are all denied except to the extent I have just indicated they are granted.