UNITED STATES of America,
Appellee,

v.

WATSON CHAPEL SCHOOL DISTRICT
NO. 24 et al., Appellants.

UNITED STATES of America,
Appellee,

v.

WATSON CHAPEL SCHOOL DISTRICT
NO. 24 et al., Appellants.

UNITED STATES of America,
Appellee,

v.

COTTON PLANT SCHOOL DISTRICT
NO. 1 et al.,

In re John Norman Warnock, Appellant.

Nos. 20699, 71-1175, 71-1180.

United States Court of Appeals,
Eighth Circuit.

Aug. 11, 1971.

**934**

John Norman Warnock, Camden, Ark., and Clyde J. Watts, Oklahoma City, Okl., for appellants; Art Givens, Little Rock, Ark., of counsel.

W. H. Dillahunty, U. S. Atty., Little Rock, Ark., and Edward S. Christenbury, Atty., Dept. of Justice, Washington, D. C., David L. Norman, Acting Asst. Atty. Gen., Brian K. Landsberg, Joseph D. Rich, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before LAY, HEANEY and BRIGHT, Circuit Judges.

LAY, Circuit Judge.

These appeals, consolidated for argument, involve (1) the propriety of the district court's order in requiring Watson Chapel School District No. 24 to implement a H.E.W. plan for a unitary school system; (2) the district court's order finding members of the school district guilty of civil contempt in failing to comply with the judgment of the court requiring implementation of that plan; and (3) the district court's order finding the attorney for the school district guilty of civil contempt and barring the attorney from future conduct in derogation of the court's decree.

We find no merit in the objections to the district court's order requiring implementation of the H.E.W. plan. We affirm the judgment in No. 20,699 and remand the cause for continuing jurisdiction of the district court. We find the appeal by the school board members from the court's finding of civil contempt moot and dismiss the appeal in No. 71–1175 for lack of jurisdiction. We likewise find the appeal by the board's attorney, John Warnock, as to the judgment of civil contempt moot and similarly dismiss the appeal in No. 71–1180 for lack of jurisdiction.

The appeal in No. 20,699 arises from a single complaint filed by the United States to require seven school districts in the State of Arkansas to adopt a unitary school system. The complaint was filed July 8, 1970, by John N. Mitchell as Attorney General of the United States, pursuant to 42 U.S.C. § 2000c–6 of the Civil Rights Act of 1964. Attached was the Attorney General's affidavit that complaints had been received from parents of minor children within the district that equal protection of the laws was being denied these children.

The record shows that the Watson Chapel District (located on the outskirts of Pine Bluff, Arkansas) covers 125 square miles. Over 50 percent of the students attending school in the district live within the city limits of Pine Bluff. In 1969–70 the district operated six schools. These schools had a total enrollment of 3,871 students. There were two high schools and four elementary schools. The Coleman High School and the Coleman Elementary School operated with 1,640 students, all black. In the remaining schools there were 96 black students and 2,135 white pupils. In the Watson Chapel High School there were 972 whites and 41 Negroes; in Owen Elementary there were 593 whites and 36 black pupils; in Edgewood Elementary there were 495 whites and 19 blacks; in Sulphur Springs Elementary, a rural school, there were 75 whites and no blacks. The few black students living in that area were bussed to the Coleman schools. The faculty was for practical purposes completely segregated.

The district court assumed jurisdiction and ordered the parties to work out a satisfactory plan. On July 24, 1970, the United States reported that the Watson Chapel School officials had failed to agree on a plan and that the representative of the Office of Education would submit a plan on or before July 31, 1970.

This plan was filed. The plan came on for hearing before the district court on August 11. On that date the district court found that a dual school system was being operated in the Watson Chapel District and that the plan of the Department of Health, Education and Welfare (H.E.W.) would "completely desegregate the district, but that the school district should be given an opportunity to develop a plan of their own to meet constitutional requirements." This plan was ordered to be filed no later than August 26, 1970.

The school district thereafter filed alternative plans. The first plan was a long range projection to raise five million dollars to build sometime in the future a central junior and senior high school complex. The second plan was simply a modified continuation of the previously rejected "freedom of choice" plan. This plan left 98 percent of the white students in the formerly white schools and 98 percent of the black students in the formerly black schools. No assignment of faculty or staff members was proposed. The district court rejected both plans.

On September 14, 1970, the district court ordered the partial implementation of the H.E.W. plan and enjoined the school district from operating a racially discriminatory dual school in Watson Chapel. Although the school semester was already under way the district court granted the school board until October 15 to work out an alternate recommendation to the H.E.W. plan that would be less burdensome and more satisfactory. On October 15, 1970, the school district responded that "there is no constitutional requirement for race mixing" and entered another formal objection to the H.E.W. plan. The school district supplemented their previously rejected proposal only by a suggested additional zoning to include a "proposed" housing area to be included in the zone occupied by the all black schools. The United States responded that few whites would ever live in the new area. Thereafter on November 17, 1970, the district court in rejecting the school board's last illusory effort wrote:

"The school district has failed and refused to present a plan reasonably expected to comply with the law. The Court has no alternative at this late date but to require the school district to operate under a lawful system. The Court has considered the two plans recommended by the Department of Health, Education and Welfare, as well as other alternatives, and concludes that the alternate plan suggested by the Department of Health, Education and Welfare would offer a more reasonable and adequate solution to the school's needs and requirements for a unitary system as required by law."

The final alternative plan submitted by H.E.W. on October 2, and accepted by the district court, restructured the district into a unified system reflecting the following racial changes.

| School | Grade | Student Enrollment | |
|---|---|---|---|
| | | W | B |
| Watson Chapel | 9–12 | 613 | 486 |
| Coleman Elem. and High | 5–8 | 710 | 617 |
| Owen Elem. | 1–4 | 399 | 351 |
| Edgewood Elem. | 1–4 | 327 | 267 |
| Sulphur Springs Elem. | 1–4 | 75 | 25 |

The district court fixed zone lines between the elementary schools. The court also required desegregation of faculty and other staff until "the ratio of Negro to white teachers in each school, and the ratio of other staff in each, are substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system."

The complete plan included appropriate orders as to future school construction and site selection, reports and transportation to promote a nonracial school system. The school board filed notice of appeal on December 11, 1970.

On February 6, 1971, the district court entered an order finding the Board of

Directors and Superintendent of Schools in civil contempt in wilfully failing to carry out the court's decree. The court allowed the board until February 11, 1971, to implement the plan or have sanction imposed. On February 11, 1971, the superintendent filed a report indicating substantial steps had been taken to implement the court's order of November 17, 1970. On the basis of this report the court entered an order on February 12 relieving the school board members and the superintendent of contempt penalties. However, at the same time the school board indicated that transportation facilities in the district had been temporarily suspended on the advice of counsel.

The court's order of November 17, 1970, had provided:

"The transportation system shall be completely reexamined regularly by the Superintendent, his staff and the school board. Bus routes and the assignment of students to buses will be designed to insure the transportation of all eligible pupils on a non-segregated and otherwise non-discriminatory basis."

The court clarified this order on February 18, 1971, by decreeing:

"It Is Therefore Ordered that the Board of Directors of Watson Chapel School District No. 24 and the Superintendent of Schools reinstate the transportation facilities on a basis which will insure the transportation of all eligible pupils on a non-segregated and otherwise non-discriminatory basis. Transportation for eligible pupils at the Sulphur Springs Elementary School shall be reinstated immediately. The Superintendent of Schools is directed to collaborate with the Arkansas State Department of Education in order to redraw existing bus routes and develop procedures and policies to insure the transportation of all other eligible pupils on a non-segregated and otherwise non-discriminatory basis."

A motion to stay or dismiss the supplemental order was filed by the school district on February 26, 1971. On March 2, 1971, the district court in a comprehensive order denied this request. The district court concluded:

"It is established that the school district provided bus transportation for eligible students in the district prior to and up to the time of implementing the desegregation plan by order of the court. It is quite obvious that bus transportation was suspended as a result of the desegregation order and, therefore, based on racial considerations.

"While this Court does not assume jurisdiction of transportation facilities by bus in the operation of the Watson Chapel schools, unless based on racial considerations, jurisdiction of the transportation facilities by the Court was established in the Court's order entered November 17, 1970. This being a part of the Court's continuing jurisdiction and as included in the Court's order of February 18, 1971, sufficient time having elapsed since the implementation of the plan, transportation for eligible students should be continued by the school district. The Court concludes that the order reestablishing bus transportation for eligible students who desire it is not only appropriate but desirable."

As indicated, appropriate appeals were filed from the court's order implementing the H.E.W. plan, and the findings of civil contempt of the board members and the school board attorney, John Warnock. We shall consider their contentions seriatim.

*No. 20,699*

■ There can be little question as to the propriety of the district court's action in ordering the adoption of the H.E. W. plan. Complaint is made that local control of schools is being divested by Washington officials, that "freedom of choice" as adopted by the school is the only constitutional plan, that the school attendance is based solely on de facto housing patterns and that busing is per se unconstitutional. These com-

plaints conveniently ignore the history of this case.

The district court was required under a constitutional mandate to order a unitary school system in the district. The school system as it was being operated was clearly impermissible in that it did not present any effective plan of integration. Judge Harris' ultimate decree requiring implementation of the H.E.W. plan patiently and painstakingly was rendered after giving the school district at least three distinct opportunities to study and submit a workable plan of its own. In all practicality there was complete defiance of the court's request and the only effort made was to offer illusory proposals which admittedly continued the school district's dual system where schools were easily identifiable as "black" or "white" schools.

This court has studied the final H.E.W. plan submitted to Judge Harris. We find it to be a thorough study and balances equitable considerations of the respective parties. It may not be the most complete or workable solution. However, the district court has now approved the plan and is satisfied that it will achieve a unitary school system. The school board has made no effort whatsoever to cooperate or to aid in solutions.

■ There is no merit to the argument that the school locations and pupil assignments are patterned on solely a de facto basis. See Haney v. County Board of Education of Sevier County, Arkansas, 410 F.2d 920 (8 Cir. 1969). As to the constitutionality of the freedom of choice plan operated in the school district, the record demonstrates that in 1969–70 94 percent of black students remained in all black schools. The district court properly ruled this plan impermissible. See Raney v. Board of Education of Gould School Dist., 391 U.S. 443, 88 S. Ct. 1697, 20 L.Ed.2d 727 (1968); Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Kemp v. Beasley, 423 F.2d 851 (8 Cir. 1970).

■ ■ The district court based its jurisdiction to require a transportation system on the fact that the school district was already engaged in busing over 1,200 students. The record indicates that these students were mostly white students, since the great majority of blacks lived close enough to the Coleman complex so as not to require bussing.[1] The decisions of Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and McDaniel v. Barresi, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971), fully demonstrate the district court's equity power to require transportation whenever and wherever necessary to disestablish a dual school system. As stated in the *Swann* case the record here supports "[t]he importance of bus transportation as a normal and accepted tool of educational policy." 91 S.Ct. at 1282.

The district court in its opinion of March 2, 1971, observed:

"In its order of November 17, 1970, the Court considered the available facilities, the location of the facilities and how they could be utilized in the operation of an integrated system in a

---

1. The record shows 98 percent of the colored people live within a two mile area of the previously all black Coleman School. The district operated in 1969–70 with 14 buses. Twelve Hundred Sixty students were bused according to district records in that school year: 48 were black, 1,212 were white students. Thus 33 percent were being transported. The principal of the school board testified the H.E.W. plan would double the requirements of busing. A. T. Miller, a program officer for the United States Office of Education in directing the H.E.W. plan observed that the plan would require, "the rerouting of present busses and if there were to be an increase it would be very slight. However, in our studying it we did not see that there would be a great increase as far as the number of buses to be used. No increase at all in that matter but just a slight extension of the bus run." This court was informed at oral argument two new school buses were acquired last spring in order to fully implement the new transportation schedule.

manner to comport with constitutional standards. To achieve this objective, there can only be one high school and one school facility such as the Coleman Schools for grades five through eight. The three available lower elementary schools appropriate to this district's operation is best suited for zone areas for each such elementary school.

"The school board, even though it has the responsibility to propose in good faith an acceptable plan, has failed to submit or offer a program that would be reasonable or acceptable with any hopes of disestablishing the traditional dual system of its schools. These uncontradicted facts illustrate that the method of operation of the schools as required by the Court's order does not lend itself to the question of racial balance. This is further demonstrated by the fact that the Sulphur Springs Elementary School's racial makeup is 75% white and 25% black. In the other two elementary schools the racial complexion is substantially different. The contention of the defendant is wholly unacceptable."

We conclude that the district court's order requiring an integrated school plan in all respects should be affirmed.

*No. 71–1175*

The district court's order of November 17, 1970, required the school board "[b]eginning no later than the commencement of the second semester of the 1970–71 school year * * * (to) assign students in accordance with the alternate recommendation of the Department of Health, Education and Welfare submitted on October 2, 1970 * * *."

No action was taken to effect this plan or to comply with the court's order. The second semester commenced January 18, 1971. On January 20, the United States sought an application for sanctions against each member of the board and the superintendent due to the segregated basis of operations. The matter came for hearing on February 5, 1971. The district court found a knowing and willful failure of the board and superintendent to implement its order of November 17, 1970. The court found each of the members and the superintendent in civil contempt and ordered them to file a sworn affidavit by February 11 stating their intention to comply or not to comply to implement that order; on failure of any member to do so the court ordered their individual incarceration in the custody of the United States Attorney General and a fine of $350 per day until the remainder of the school year.

On February 11, 1971, appropriate affidavits were filed and a detailed statement implementing the court's order was attached. Notwithstanding the board's refusal to adopt a transportation system,[2] the court found compliance with its previous contempt order and on February 12 relieved the parties of any penalties. An appeal was filed from the court's order of February 6, 1971, as to the original imposition of sanctions ordered.

We find the matter not reviewable since the issues are moot. There has been full compliance with the court's order. The record shows the parties have purged themselves of any contempt citation, and the sanctions have been lifted. Under these circumstances there is no justiciable controversy pending before this court and the appeal must be dismissed for lack of jurisdiction. See St. Pierre v. United States, 319 U.S. 41, 63 S.Ct. 910, 87 L.Ed. 1199 (1943); F.T.C. v. Stroiman, 428 F.2d 808 (8 Cir. 1970); Murrell v. United States, 253 F. 2d 267 (5 Cir. 1958), cert. denied, 358 U.S. 841, 79 S.Ct. 65, 3 L.Ed.2d 76. Cf. Guerrero v. Capitol Fed. Savings & Loan Ass'n., 197 Kan. 18, 415 P.2d 257 (1966).

*No. 71–1180*

On March 29, 1971, the district court ordered a writ of attachment against John N. Warnock, attorney for the school

2. This was later clarified and required to be fully implemented in the court's March 2 order, supra.

board, to show cause why he should not be held in civil contempt.[3] This order arose because of Warnock's "making public speeches, TV appearances, arranging mass meetings in defiance of the court's orders and continuing to urge resistance and defiance of the court's orders by patrons of the Watson Chapel School District and others."

The district court thereafter conducted a plenary hearing and found that Warnock had "knowingly, wilfully and wantonly obstructed the implementation" of the court's orders requiring a unitary school assignment plan for Watson Chapel.

The court found that Warnock had:

"[E]ncouraged patrons of Watson Chapel School Board No. 24 to send their children to schools other than those to which the children have been assigned pursuant to the order of this Court of November 17, 1970.

"[O]bstructed the orderly operation of schools after entry of the February 6, 1971 order of this Court by aiding and participating in actions by the defendant school board president calculated to threaten not to pay faculty and staff members of the school district in accordance with state law.

"[A]dvised and encouraged the defendant school board to suspend all transportation facilities prior to implementation of the court-ordered desegregation plan with the effect of frustrating and obstructing the orderly operation of the public schools in compliance with this Court's orders.

"[A]ppeared at mass meetings and made public statements to the mass media with the purpose and effect of encouraging mass disobedience to orders of this Court, and in so doing has impugned the honor and integrity of the Court."

The court then found Warnock guilty of civil contempt and ordered that unless Warnock certify on the same day "that he will refrain from taking actions which obstruct the orderly implementation of this Court's orders and that he will make no further public statements, including statements to the mass media, which are intended to, or have the effect of, encouraging disobedience with lawful orders of this Court" that sanctions would be applied. The sanctions included a fine of $500 on that date, $350 each day thereafter and incarceration until such time as full compliance, for the remainder of the school year.

On that date, April 2, 1971, Warnock filed a certificate agreeing to obey the court's order of February 5 and to refrain from the prohibited activities so long as he was counsel for the Watson Chapel School District.

Appeal was then filed as to the order finding Warnock in contempt. On April 6 the court determined Warnock's certificate to be in compliance with the terms of its order. The court relieved Warnock of the penalties imposed and stated that he will "be relieved so long as he takes no action contrary to the court's orders."

On appeal the appellant, Warnock, raises several legal issues, inter alia, that the order prohibiting "public statements" was too broad and violative of his freedom of speech.

■ We likewise find this appeal moot. There exists no sanction en force to present a justiciable controversy for appellate review. In re Eskay, 122 F.2d 819 (3 Cir. 1941). The contemnor has seen fit to certify that he has disengaged from any activity violative of or in encouraging violation of the court decree. By purging himself of the contempt, nothing remains.

---

3. Due to our ultimate holding of lack of jurisdiction we make no observation as to the propriety of treating attorney Warnock's citation as one for civil contempt as contrasted to criminal contempt.

As to the distinctions existing see the excellent summary of the governing principles of law in Mechanic v. Gruensfelder, 461 S.W.2d 298 (St. Louis, Mo.Ct.App. 1970).

**940**

The fact that the court conditions the relief on future compliance does not make the issue justiciable. Cf. F. T.C. v. Stroiman, supra. Compliance is intended for all court orders until set aside by a higher court. The breadth of the court order can only be tested by actual facts. We only add that it requires little imagination and understanding to comprehend the full intent of the court's order as it specifically relates to defiance of the court's decree calling for a unitary school system in Watson Chapel School District. If the defendant is cited for future violation of that order the facts and procedure surrounding any future order can be subject to appellate review at that time. Cf. St. Pierre v. United States, 319 U.S. 41, 43, 63 S.Ct. 910, 87 L.Ed. 1199 (1943). To render an appellate decision at this time would be to give an advisory opinion on abstract facts. This, we have no power to do.

The appeal in 71–1180 is dismissed as moot.

In summary, the judgment in No. 20,-699 is affirmed and the case remanded to the continuing jurisdiction of the district court; the appeals in No. 71–1175 and No. 71–1180 are ordered dismissed as moot.