# Constitutionality of Legislation Limiting the Remedial Powers of the Inferior Federal Courts in School Desegregation Litigation

Proposed legislative restriction on the power of the inferior federal courts to order busing remedies in school desegregation litigation cannot be justified as an exercise of congressional power to enforce the Fourteenth Amendment, if such a restriction would prevent a court from fully remedying a constitutional violation.

Proposed legislation can be justified as an exercise of congressional power under Article III, § 1 of the Constitution, which gives Congress very broad power to control the jurisdiction of the inferior federal courts. The bill does not usurp the judicial function by depriving the lower courts of power to hear desegregation cases and to impose remedies which do not involve busing, nor does it instruct the lower courts how to decide issues of fact in pending cases, or require reversal of any outstanding court order.

The bill's provision prohibiting the Department of Justice from using appropriated funds to bring or maintain an action to require busing is constitutional despite the limitations that it would impose on the Executive's discretion, since it does not preclude the Department from fulfilling its statutory obligation to enforce the law through seeking other effective remedies or objecting to inadequate desegregation plans.

Both the limitation on courts and on the Department of Justice should be upheld if challenged under the equal protection component of the Fifth Amendment's Due Process Clause, since neither limitation creates a racial classification nor evidences a discriminatory purpose

May 6, 1982

THE CHAIRMAN OF THE COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES

DEAR MR. CHAIRMAN: This responds to your request concerning those portions of S. 951, the Senate-passed version of the Department of Justice appropriation authorization bill for fiscal year 1982, which relate to the mandatory transportation of school children to schools other than those closest to their homes ("busing").* One of these provisions relates to the remedial powers of the inferior courts and the other to the authority of the Department of Justice. This letter discusses the effect of these provisions as well as the policy and constitutional implications of the provisions as construed. The funding provisions of S. 951 will be addressed in a separate letter by the Assistant Attorney General of the Office of Legislative Affairs.

---

*NOTE: The relevant portions of S 951, 97th Cong , 2d Sess., are reprinted at 128 Cong Rec S1336 (daily ed. Mar 2, 1982) Ed

1

It is important to note at the outset that S. 951 does not withdraw jurisdiction from the Supreme Court or limit the jurisdiction of the federal courts to decide a class of cases. The provisions of the bill and its legislative history make clear that the effect of these provisions relate only to one aspect of the remedial power of the inferior federal courts—not unlike the Norris–LaGuardia Act, enacted in 1932. Nor do the provisions limit the power of state courts or school officials to reassign students or require transportation to remedy unconstitutional segregation. Careful examination of these provisions indicates that they are constitutional.

## I. Busing Provisions of S. 951

The first provision, § 2 of the bill, entitled the Neighborhood School Act of 1982, recites five congressional findings to the effect that busing is an inadequate, expensive, energy-inefficient, and undesirable remedy. It then states (§ 2(d)) that, pursuant to Congress' power under Article III, § 1 and § 5 of the Fourteenth Amendment, "no court of the United States may order or issue any writ directly or indirectly ordering any student to be assigned or to be transported to a public school other than that which is closest to the student's residence unless" such assignment or transportation is voluntary or "reasonable." The bill declares that such assignment or transportation is not reasonable if

> (i) there are reasonable alternatives available which involve less time in travel, distance, danger, or inconvenience;
>
> (ii) such assignment or transportation requires a student to cross a school district having the same grade level as that of the student;
>
> (iii) such transportation plan or order or part thereof is likely to result in a greater degree of racial imbalance in the public school system than was in existence on the date of the order for such assignment or transportation plan or is likely to have a net harmful effect on the quality of education in the public school district;
>
> (iv) the total actual daily time consumed in travel by schoolbus for any student exceeds thirty minutes unless such transportation is to and from a public school closest to the student's residence with a grade level identical to that of the student; or
>
> (v) the total actual round trip distance traveled by schoolbus for any student exceeds 10 miles unless the actual round trip distance traveled by schoolbus is to and from the public school closest to the student's residence with a grade level identical to that of the student.

Section 2(f) of the bill adds a new subparagraph to § 407(a) of Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c-6(a), authorizing suits by the Attorney General to enforce rights guaranteed by the bill if he determines that a student has been required to attend or be transported to a school in violation of the

2

bill and is otherwise unable to maintain appropriate legal proceedings to obtain relief. The bill is made "retroactive" in that its terms would apply to busing ordered by federal courts even if such order were entered prior to its effective date. Section 16 of the bill supplements these provisions by providing that "[n]otwithstanding any provision of this Act, the Department of Justice shall not be prevented from participating in any proceedings to remove or reduce the requirement of busing in existing court decrees or judgments."

The second provision, § 3(1)(D), limits the power of the Department of Justice to bring actions in which the Department would advocate busing as a remedy:

> No part of any sum authorized to be appropriated by this Act shall be used by the Department of Justice to bring or maintain any sort of action to require directly or indirectly the transportation of any student to a school other than the school which is nearest to the student's home, except for a student requiring special education as a result of being mentally or physically handicapped.

## II. General Comments

There appear to be ambiguities in the Neighborhood School Act's provisions for suits to be brought by the Attorney General challenging existing decrees. For example, it is unclear what, if any, obligations are placed on the Attorney General with regard to court decrees that offend § 2. Since the bill does not purport to prevent any governmental entities other than federal courts from requiring the transportation of students, the Attorney General's review of a complaint must include the inquiry whether the transportation is the result of federal court action. It is difficult to determine the party against whom the action is to be brought. The assignment violates the Neighborhood School Act only if it is required by court order. Does the Attorney General sue the court? If so, then what relief is appropriate? Does the bill permit an action against a school board even though its actions are not the subject of the bill's prohibition? If a school board is the defendant, then what relief is appropriate? Does the Attorney General ask that the school board be enjoined from complying with the court order? Does he ask for a declaratory judgment of the board's obligations under the order? If the latter is the case and the board wishes to continue its present assignment patterns, what will have been accomplished by the lawsuit? These questions illustrate the problems incident to the provisions that allow for collateral attack on existing decrees.

Serious concern arises also because of the limitation on the Attorney General's discretion contained in § 3(1)(D). This Administration has repeatedly stated its objection to the use of busing to remedy unlawful segregation in public schools. *See* Testimony of Wm. Bradford Reynolds, Assistant Attorney General, Civil Rights Division, Before the Subcomm. on Separation of Powers of the Senate Comm. on the Judiciary, *Desegregation of Public Schools* (Oct. 16, 1981). The express limitation on the Department's authority is unnecessary and may inhibit

3

the ability to present and advocate remedies which may be less intrusive and burdensome than those being urged on a court by other litigants. Moreover, because the limitation is imposed only in the Department's one-year authorization, there is no force to the argument that a statutory provision is necessary to ensure that successive Administrations will also carry out congressional intent. Finally, to the extent that Congress does intend to effect a long-term substantive change in the law, the proper vehicle would seem to be permanent substantive legislation, not an authorization bill which must be reviewed annually by Congress and which becomes more difficult to enact and thus less efficient for its necessary purposes when it is encumbered by extraneous matters.

## III. Constitutionality

### A. Textual Interpretation of the Neighborhood School Act of 1982

The Neighborhood School Act restricts the power of inferior federal courts to issue remedial busing decrees where the transportation requirement would exceed specified limits of reasonableness. That it does not purport to limit the power of state courts or school boards is amply demonstrated by its text and by statements of its supporters. Senator Hatch, in a colloquy with Senator Johnston, stated that "this bill does not, however, restrict in any way the authority of State courts to enforce the Constitution as they wish . . . ." 127 Cong. Rec. S6648 (daily ed. June 22, 1981). On the day that the bill passed the Senate, Senator Johnston echoed these remarks:

> If a school board wants to bus children all over its parish or all over its county, it is not prohibited from doing so by this amendment. Nor indeed would a State court if it undertook to order that busing. The legislation deals only with the power of the Federal courts . . . .

128 Cong. Rec. S1324 (daily ed. March 2, 1982).

The impact of the Neighborhood School Act on the federal courts is also limited. It withdraws, in specified circumstances, a single remedy from the inferior federal courts. The substantial weight of the text and legislative history supports the proposition that the bill limits the remedial power only of the inferior federal courts, not the Supreme Court. There is strong textual support for this conclusion, because the bill recites that it is enacted pursuant to congressional power under Article III, § 1. Section 1 of Article III provides authority for limiting the jurisdiction and the powers of the inferior federal courts, not the Supreme Court. The source of congressional authority relative to the jurisdiction of the Supreme Court is the Exceptions Clause, Art. III, § 2, cl. 2. The conspicuous and apparently intentional omission of that clause as a source of congressional authority to enact this measure strongly indicates that no restriction of the Supreme Court appellate jurisdiction was intended.

4

Moreover, there do not appear to be any direct statements in the legislative history to the effect that any restriction on the Supreme Court's jurisdiction was intended. To the contrary, there is an explicit colloquy between Senators Hatch and Johnston indicating that no restriction on Supreme Court jurisdiction was intended. In response to a question posed by Senator Mathias to Senator Johnston, Senator Hatch stated:

> There is little controversy, in my opinion . . . that the constitutional power to establish and dismantle *inferior Federal courts* has given Congress complete authority over their jurisdiction. This has been repeatedly recognized by the Supreme Court . . . .

> This amendment would be only a slight modification of *lower Federal court* jurisdiction. These *inferior Federal courts* would no longer have the authority to use one remedy among many for a finding of a constitutional violation.

> \*        \*        \*        \*        \*

> I would hasten to add that *this bill does not, however, restrict in any way . . . the power of the Supreme Court to review State court proceedings and insure full enforcement of constitutional guarantees.*

> In short, this is a very, very narrow amendment. It only withdraws a single remedy which Congress finds inappropriate *from the lower Federal courts.*

> \*        \*        \*        \*        \*

> MR. JOHNSTON. Mr. President, I thank the distinguished Senator from Utah for his exegesis on the legality, the power of Congress under article III to restrict jurisdiction.

127 Cong. Rec. S6648–49 (daily ed. June 22, 1981) (emphasis added).

## B. *Legal Status of Transportation Remedies*

In *Brown* v. *Board of Education,* 349 U.S. 294, 300 (1955) (II), the Supreme Court held that federal courts must be guided by equitable principles in the design of judicial remedies for unlawful racial segregation in public school systems. Under those principles, as the Court has more recently explained, "the remedy is necessarily designed, as all remedies are, to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Milliken* v. *Bradley (Bradley I),* 418 U.S. 717, 746 (1974) (I). The Court has indicated that the principle that justifies judicial discretion to impose transportation remedies also implies a limitation on that discretion.

The judicial power to impose such remedies "may be exercised only on the basis of a constitutional violation," *Swann* v. *Charlotte-Mecklenburg,* 402 U.S. 1, 16 (1971), and "a federal court is required to tailor 'the scope of the remedy' "

5

which included the transportation of students to schools other than the ones which they had formerly attended, "to fit 'the nature and the extent of the constitutional violation,'" *Dayton* v. *Brinkman*, 433 U.S. 406, 420 (1977), quoting *Bradley I*, at 744. In other words, reassignment of students and concomitant transportation of students to different schools is appropriate only when it is "indeed . . . *remedial*," *Milliken* v. *Bradley (Bradley II)*, 433 U.S. 267, 280 (1977) (emphasis in original), that is, when it is aimed at making available to the victims of unlawful segregation a school system that is free of the taint of such segregation.

The Supreme Court has stated that circumstances might conceivably exist in which the imposition of a desegregation remedy which included the transportation of students to schools other than the ones which they had formerly attended would be unavoidable in order to vindicate constitutional rights. If school authorities have segregated public school students by race, they shoulder a constitutional obligation "to eliminate from the public schools all vestiges of state-imposed segregation," *Swann*, 402 U.S. at 15. The Court has said that if this duty cannot be fulfilled without the mandatory reassignment of students to different schools, with the concomitant requirement of student transportation, this remedy cannot be statutorily eliminated. In *North Carolina* v. *Swann*, 402 U.S. 43 (1971), the Court overturned a North Carolina statute that proscribed the assignment of students to any school on the basis of race, "or for the purpose of creating a racial balance or ratio in the schools," and prohibited "involuntary" busing in violation of the statutory proscription. The Chief Justice, writing for a unanimous Court, concluded:

> [I]f a state-imposed limitation on a school authority's discretion operates to inhibit or obstruct the operation of a unitary school system or impede the disestablishing of a dual school system, it must fall; state policy must give way when it operates to hinder vindication of federal constitutional guarantees.
>
> *        *        *        *        *
>
> We likewise conclude that an absolute prohibition against transportation of students assigned on the basis of race, "or for the purpose of creating a balance or ratio," will similarly hamper the ability of local authorities to effectively remedy constitutional violations. As noted in *Swann, supra*, at 29, bus transportation has long been an integral part of all public educational systems, and it is unlikely that a truly effective remedy could be devised without continued reliance upon it.

402 U.S. at 45–46.

Although the Court has indicated that some student transportation might be a necessary incident to a desegregation decree, it has never stated with particularity what those cases might be, nor has it identified the limitations on busing orders in cases where transportation is constitutionally required. In *Swann* v. *Charlotte-Mecklenburg, supra*, for example, the Court declined to provide "rigid

guidelines" governing the appropriateness of busing remedies. It stated only that busing was to be limited by factors of time and distance which would "either risk the health of the children or significantly impinge on the educational process." 402 U.S. at 30–31. Limits on time and distance would vary with many factors, "but probably with none more than the age of the students." *Id.* at 31.

## C. *Congressional Power Under § 5 of the Fourteenth Amendment*

In light of the Supreme Court's conclusion that student transportation might in some circumstances be a necessary feature of a remedial desegregation decree, it is necessary to consider whether the limitation on the power of the inferior federal courts under the Neighborhood School Act would be justified as an exercise of congressional authority under § 5 of the Fourteenth Amendment. Section D, *infra,* focuses on Congress' power under Article III, § 1, which is broader in this context than § 5.

Section 5 provides that Congress "shall have power to enforce, by appropriate legislation, the provisions of" the Fourteenth Amendment, including the Equal Protection Clause, which has been held to guarantee all students a right to be free of intentional racial discrimination or segregation in schooling. *Brown* v. *Board of Education,* 347 U.S. 483 (1954). The question is whether congressional power to enforce that right by appropriate legislation includes authority to limit the power of the lower federal courts to award transportation remedies generally and specifically in those cases in which some transportation is necessary fully to vindicate constitutional rights.

The cases of *Katzenbach* v. *Morgan,* 384 U.S. 641 (1966); *Oregon* v. *Mitchell,* 400 U.S. 112 (1970); *City of Rome* v. *United States,* 446 U.S. 156 (1980); and *Fullilove* v. *Klutznick,* 448 U.S. 448 (1980) (plurality opinion), firmly establish that the § 5 power is a broad one. Congress may enact statutes to prevent or to remedy situations which, on the basis of legislative facts, Congress determines to be violative of the Constitution. At the same time, these cases rather firmly establish that Congress is without power under § 5 to revise the Court's constitutional judgments if the effect of such revision is to "restrict, abrogate, or dilute" Fourteenth Amendment guarantees as recognized by the Supreme Court.

The limitation on busing remedies contained in the Neighborhood School Act would be authorized under § 5 of the Fourteenth Amendment to the extent that it does not prevent the inferior federal courts from adequately vindicating constitutional rights. The grant of power under § 5 to "enforce" the Fourteenth Amendment carries with it subordinate authority to determine specific methods by which that amendment is to be enforced. As an incident of its enforcement authority, therefore, Congress may instruct the lower federal courts not to order mandatory busing in excess of the § 2(d) limits, so long as the court retains adequate legal or equitable powers to remedy whatever constitutional violation may be found to exist in a given case.

Moreover, federal and state courts would probably pay considerable deference to the congressional factfinding upon which the bill is ultimately based in

7

determining the scope of constitutional requirements in this area. The Court has stated that, so long as it can "perceive a basis" for the congressional findings, *Katzenbach* v. *Morgan,* 384 U.S. at 653, it will uphold a legislative determination that a situation exists which either directly violates the Constitution or which, unless corrected, will lead to a constitutional violation. Similar deference would be appropriate for findings under this bill, notwithstanding the somewhat limited hearings which were held and the absence of printed reports. It does not appear that any particularized research was presented to the Senate which might have supported or undermined the specific limitations on federal court decrees contained in § 2(d) of S. 951. It is likely, however, that the time and distance limitations contained in § 2(d) of the bill would serve as legitimate benchmarks for federal and state courts in the future in devising appropriate decrees. To this extent, the exercise of congressional power under § 5 would be fully proper and effective.

Nor does it appear that the Neighborhood School Act would be interpreted to "dilute" Fourteenth Amendment rights merely because it denies a certain form of relief in the inferior federal courts or includes certain retroactivity provisions in §§ 2(f) and (g). Congress cannot, under § 5, prohibit a federal district court from granting a litigant all the relief that the Fourteenth Amendment requires. Moreover, the state courts would remain open to persons claiming unconstitutional segregation in education after this bill becomes law, and would be empowered—indeed, required—to provide constitutionally adequate relief.

Under § 5 Congress cannot impose mandatory restrictions on federal courts in a given case where the restriction would prevent them from fully remedying the constitutional violation. Congressional power to enforce the Fourteenth Amendment is not a power to determine the limits of constitutional rights. Although it includes the power to limit the equitable discretion of the lower federal courts to impose remedial measures which are not necessary to correct the constitutional violation, the courts must retain remedial authority sufficient to correct the violation. And although Congress can express its view through factfinding, but subject to the limitations set forth in § 2(d) of the bill, that busing is an ineffective remedial tool and that extensive busing is not necessary to remedy a constitutional violation, it is ultimately the responsibility of the courts to determine, after giving due consideration to the congressional findings contained in this bill, whether in a given case an effective remedy requires the use of mandatory busing in excess of the limitations set forth in § 2(d) of the bill.

In sum, Congress, pursuant to § 5, can: (1) limit the authority of federal district courts to require student transportation where it is not required by the Constitution; and (2) adopt guidelines, based on legislative factfinding, as to when busing is effective to remedy the violation, which guidelines will tend to receive substantial deference from the courts. Section 5 does not, however, authorize Congress to preclude the inferior federal courts from ordering mandatory busing when, in the judgment of the courts, such busing is necessary to remedy a constitutional violation. This authority must be found, if at all, in the

power of Congress under Article III, § 1 to restrict the jurisdiction of the lower federal courts.

### D. Congressional Power Under Article III, § 1

Congress' authority to limit the equitable powers of the inferior federal courts has been repeatedly recognized by the Supreme Court. Article III, § 1 of the Constitution provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." *See also* U.S. Const. Art. 1, § 8, cl. 9 (giving Congress power to "constitute Tribunals inferior to the supreme Court"). It seems a necessary inference from the express decision of the Framers that the creation of inferior courts was to rest in the discretion of Congress that, once created, the scope of the court's jurisdiction was also discretionary. The view that, generally speaking, Congress has very broad control over the inferior federal court jurisdiction was accepted by the Supreme Court in *Cary* v. *Curtis*, 44 U.S. (3 How.) 236 (1845), and *Sheldon* v. *Sill*, 49 U.S. (8 How.) 441 (1850). That view remains firmly established today.

Congress' power over jurisdiction has been further recognized, most notably in cases under the Norris–LaGuardia Act, to include substantial power to limit the remedies available in the inferior federal courts. In *Lauf* v. *E.G. Shinner & Co.*, 303 U.S. 323, 330 (1938), the Court upheld provisions of the Norris–LaGuardia Act which imposed restrictions on federal court jurisdiction to issue restraining orders or injunctions in cases growing out of labor disputes. In two cases under the Emergency Price Control Act of 1942, the Supreme Court recognized the power of Congress to withdraw certain cases from the jurisdiction of the inferior federal courts and to prohibit any court from issuing temporary stays or injunctions. *See Lockerty* v. *Phillips*, 319 U.S. 182 (1943); *Yakus* v. *United States*, 321 U.S. 414 (1944).

The provisions of the Neighborhood School Act appear to be firmly grounded in Congress' Article III, § 1 power, as interpreted in *Lauf, Lockerty*, and *Yakus*, to control the inferior federal court jurisdiction. The bill does not represent an attempt by Congress to use its power to limit jurisdiction as a disguise for usurping the exercise of judicial power. The bill does not instruct the inferior federal courts how to decide issues of fact in pending cases. *See United States* v. *Klein*, 80 U.S. (13 Wall.) 128 (1872).

Nor does the bill usurp the judicial function by depriving the inferior federal courts of their power to issue any remedy at all. The bill does not withdraw the authority of inferior federal courts to hear desegregation cases or to issue busing decrees, so long as they comport with the limitations in § 2(d) of S. 951. This limited effect on the court's remedial power does not convert the judicial power— to hear and decide particular cases and to grant relief—into the essentially legislative function of deciding cases without any power to issue relief affecting individual legal rights or obligations in specific cases. Whatever implicit limita-

9

tions on Congress' power to control jurisdiction might be contained in the principle of separation of powers, they are not exceeded by this bill, which does not withdraw all effective remedial power from the inferior federal courts.

Neither the text of the bill nor the legislative history appears to support the conclusion that the bill requires an automatic reversal of any outstanding court order that imposed a busing remedy beyond the limits specified in the bill. Such an attempt to exert direct control over a court order would raise constitutional problems associated with legislative revision of judgments. *E.g., Hayburn's Case*, 2 U.S. (2 Dall.) 409 (1792) (on petition for mandamus). The "retroactive" effect is felt instead through a change in the substantive law, in this case the law of remedies, to be applied by courts in determining whether to impose or to revise a busing remedy, coupled with the grant of authority to the Attorney General to seek relief on behalf of a student transported in violation of the Act. Upon the Attorney General's application, the court would itself determine whether the busing remedy was consistent with the Act. The bill, therefore, does no more than require the court to apply the law as it would then exist at the time of its decision in a "pending" case. *See The Schooner Peggy*, 5 U.S. (1 Cranch) 103 (1801).

The busing remedy is "pending" and not final to the extent that the court has retained jurisdiction over the case or the order is otherwise subject to modification by the court in the exercise of its equity jurisdiction. *See United States v. Swift & Co.*, 286 U.S. 106, 114–15 (1932). Prior to or in the absence of relief by the court from a previously imposed busing order, the parties before the court would be required to continue to perform pursuant to the court's order. *Cf. Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. (18 How.) 421 (1856).

*E. Constitutionality of § 3(1)(D)*

Section 3(1)(D) of the bill prohibits the Department of Justice from using any appropriated funds to bring or maintain any action to require, directly or indirectly, virtually any busing of school children. The Department's authority to institute litigation under Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c-6, against segregated school systems would not be diminished. Nor would the federal courts, under this section, be limited in their power to remedy constitutional violations. The effect of § 3(1)(D) is only to prohibit the Department in the litigation in which it is involved from seeking, directly or indirectly, a busing remedy. If the language and legislative history of the bill, as finally enacted, support this interpretation, it would appear that § 3(1)(D) would be upheld despite the limitations that it would impose on the discretion currently possessed by the Executive Branch.

The limitation would restrict the litigating authority presently conferred upon the Department by Title IV to seek all necessary relief to vindicate the constitutional rights at stake. At least in cases that do not involve the use of federal funds by segregated school systems, the Executive's authority may be restricted to this limited extent. Because the restriction does not entirely preclude enforcement

10

actions by the United States, § 3(1)(D) does not impermissibly limit the Executive's "inherent" authority to remedy constitutional violations, to the extent recognized in *United States v. City of Philadelphia*, 644 F.2d 187 (3d Cir. 1980), or *New York Times Co. v. United States*, 403 U.S. 713, 741–47 (1971) (Marshall, J., concurring). And because the restriction applies only to one remedy and does not preclude the Department from seeking other effective remedies or prevent the Executive from objecting to inadequate desegregation plans, § 3(1)(D) does not exceed the congressional power over the enforcement authority that is granted.

Where federal funds are provided, § 3(1)(D) would be constitutional if read to preserve the government's ability to fulfill its Fifth Amendment obligations by initiating antidiscrimination suits, restricting only, and in a very limited fashion, the Department's participation, by seeking a busing order, in the remedial phase of such suits. The Department would be authorized to seek alternative remedies and to comment on the sufficiency of these alternatives. If the alternative remedies to busing are inadequate in a particular case to vindicate the rights at stake, the court would retain authority, subject, of course, to the Neighborhood School Act provisions, to order a transportation remedy. The Department could be asked to comment on the sufficiency of this remedy if ordered by the court.

Moreover, § 3(1)(D) would not appear to disable the Department of Justice from seeking a court order foreclosing the receipt of federal funding by schools in unconstitutionally segregated school systems in those cases, if any, where the court was prevented by the limits contained in the Neighborhood School Act from issuing an adequate remedy and the administrative agency was precluded from terminating federal funds. *See Brown v. Califano*, 627 F.2d 1221 (D.C. Cir. 1980).

## F. Due Process Clause

Finally, both the limitation on the courts under the Neighborhood School Act and on the Department of Justice under § 3(1)(D) should be upheld if challenged under the equal protection component of the Fifth Amendment's Due Process Clause, *see Bolling v. Sharpe*, 347 U.S. 497 (1954), as a deprivation of a judicial remedy from a racially identifiable group. These provisions neither create a racial classification nor evidence a discriminatory purpose. Absent either of these constitutional flaws, the provisions will be upheld if they are rationally related to a legitimate government purpose. *See Harris v. McRae*, 448 U.S. 297 (1980).

As the law has developed, the courts will review statutory classifications according to a "strict scrutiny" standard either if they create a racial or other "suspect" classification, *e.g., Hunter v. Erickson*, 393 U.S. 385 (1969), or if they reflect an invidious discriminatory purpose. *E.g., Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977); *Washington v. Davis*, 426 U.S. 229 (1976); *cf. City of Mobile v. Bolden*, 446 U.S. 55 (1980) (plurality opinion). Satisfaction of the strict scrutiny standard requires a classification that is narrowly tailored to achieve a compelling govern-

11

mental interest. Neither basis for invoking strict scrutiny appears to be applicable here.

First, these provisions, unlike the provision found unconstitutional in *Hunter* v. *Erickson, supra,* do not contain a racial classification. Mandatory busing for the purpose of achieving racial balance is only one of the circumstances in which student transportation is placed off limits to Justice Department suits or district court orders. The proposals prohibit Justice Department suits or court orders for the transportation of students specified distances or away from the schools nearest their homes for any reason. Moreover, a racial classification would not result even if these provisions limited advocacy or ordering of mandatory busing only to achieve racial integration. The issue of what sorts of remedies the Justice Department should advocate or the federal district courts should order simply does not split the citizenry into discrete racial subgroups. *Cf. Personnel Administrator* v. *Feeney,* 442 U.S. 256 (1979).

Second, there appears to be no evidence of purposeful discrimination. Whatever might be the arguable impact on racial minorities, the legislative history to date contains no suggestion of an invidious discriminatory purpose. To the contrary, the sponsors and supporters of these measures endorsed the decision in *Brown* v. *Board of Education,* 347 U.S. 483 (1954), and repeatedly stated their abhorrence of *de jure* segregation in schooling. The proponents rest their support of this legislation on the conclusion that busing has been destructive not only of quality education for all students but also of the goal of desegregation. Even the opponents of the bill did not suggest that any invidious purpose was present.

Accordingly, the bill will not be subject to review under the strict scrutiny standard. Instead, the bill will be reviewed, and upheld, under the principles of equal protection, if it is rationally related to a legitimate governmental purpose. This test is a highly deferential one. It is reasonably clear that the defects in busing noted by the proponents of the bill and discussed above would suffice to satisfy the minimum rationality standard. Moreover, the proponents of these provisions advanced other rationales to support the measure, including that mandatory busing is an excessive burden on the taxpayer; that it wastes scarce petroleum reserves; and that education is a local matter that should be administered on a local level. These reasons appear to be legitimate governmental purposes, and the busing restrictions appear to be rationally related to these purposes.

It should be noted in closing that these conclusions are predicated in substantial part on the legislative history of this bill to date. Subsequent history in the House or thereafter could well affect these views.

Sincerely,
WILLIAM FRENCH SMITH

12