Robert **JEFFERSON** et al., Plaintiffs,

v.

**BOARD OF EDUCATION OF FAYETTE COUNTY, KENTUCKY, a body corporate, and Guy S. Potts, Superintendent, Fayette County Public Schools, Defendants.**

No. 2309.

United States District Court,
E. D. Kentucky,
Lexington Division.

June 13, 1972.

Robert Allen Sedler, Lexington, Ky., for plaintiffs.

Harbison, Kessinger, Lisle & Bush by B. L. Kessinger, Jr., William E. Sloan, Lexington, Ky., for defendants.

## OPINION

SWINFORD, District Judge.

The plaintiffs and those persons similarly situated have instituted this case for declaratory and other relief against the defendant, the Fayette County Board of Education. It is contended that the Board has not properly desegregated the elementary and junior high schools of the school system in accordance with the Constitution of the United States. It is argued that the elementary and junior high school systems are not unitary and that all vestiges of state imposed segregation have not been eliminated.

There are thirty-five elementary schools housing 19,517 students and eleven junior high schools housing 9,140 students in the Fayette County School System. Over 70% of the black elementary students attend seven schools which are nearly wholly black or which have a black majority: Booker T. Washington, 99.8% black; Constitution, 98.4% black; Douglass, 97% black; Johnson, 76.9% black; Russell, 78% black; Ashland, 55.6% black; and Carver, 55.3% black. Prior to Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L. Ed. 873 (1954), Booker T. Washington, Douglass, Constitution and Carver were, under state law, segregated black schools. Nearly half of all of the black elementary school students attend these four schools.

On the junior high level at least 40% of all black junior high students attend two racially identifiable black schools; Dunbar which is 87% black and Lexington Junior which is 78.5% black.

Six of the elementary schools which are predominantly or wholly black (Booker T. Washington, Douglass, Carver, Johnson, Constitution and Russell) all encompass contiguous zones within the inner city. The zones of these schools circumscribe with such a degree of accuracy the black residential areas of the city that the exclusion of white residential areas, which do exist within the inner city, from these zones appears to have been purposeful. Moreover these zones, with the possible exception of Douglass, are entirely arbitrary, not being defined by preexisting boundaries or obstacles. It also appears that all of these black inner city schools are operating substantially below pupil capacity level.

The two junior high schools under consideration, Lexington Junior and Dunbar Junior, also circumscribe zones within the inner city. Here again the zones encompass predominantly black residential areas. These two schools are, like the elementary schools involved, operating at far below their physical capacity, while many of the surrounding junior high schools composed primarily of white students are operating at or above their designed capacities.

At the time this suit was filed Carver, Constitution, Douglass, Johnson, Russell, Lexington Junior and Dunbar Junior were listed by the Fayette County School Board to be in fair or poor condition. Significantly, all of the remaining schools within the elementary and junior high systems, one or two possible exceptions notwithstanding, were listed to be in good or, more usually, excellent condition.

It is also worthy of note that in the school year prior to the time this suit was filed—1970–71—the black teachers within the elementary and junior high systems were, with rare exception, confined entirely to the racially identifiable black schools. This situation, however,

was rectified by the Board which adopted for the 1971–72 school year, the year in which this suit was filed, a teacher distribution plan that evenly assigned the black and white teachers among all of the schools. The case, therefore, does not involve an issue of teacher segregation.

Prior to 1955 and the Brown v. Board of Education decision, Kentucky imposed by law racial segregation within its schools. See Baldwin's Kentucky Revised Statutes, 1955 edition, 158.020. In deciding the case the court must determine whether segregation exists within the elementary and junior high school systems and determine whether that segregation, if it exists, is in fact a vestige of state supported segregation, or whether it is de facto in nature resulting strictly from permissible and justifiable influences beyond the Board's control such as housing patterns and natural neighborhood zones.

The defendant Board, with respect to both the elementary and junior high school systems, makes two principal arguments:

(1) It is asserted that the school system is in fact unitary;

a) it is argued that it is improper to isolate several schools from the entire system, which must be viewed as a whole,

b) and that the majority of the schools within the system are integrated thereby making the system, as a whole, a unitary one.

2) It is suggested that whatever segregation which may exist within the system is de facto and beyond the Board's or the court's control;

a) it is contended that the Board has attempted to achieve a walk-in neighborhood school system at the elementary and junior high levels,

b) that the Board has desegregated the schools but because of changing housing patterns the schools have become resegregated,

c) that any existing segregation is caused by housing patterns or natural boundaries,

d) that the utilization of the inner city schools is purposefully under capacity because of the "special enrichment" programs,

e) and that as a part of the Board's system a majority to minority transfer plan has been adopted to ameliorate de facto segregation.

 It is true that the plaintiffs have not made claims as to each of the schools in the elementary and junior high systems. But this must not detract from the fact that the case involves a substantial number of the black pupils participating in the elementary and junior high school programs of Fayette County. The schools the plaintiffs have challenged educate over 60% of all the black students within the elementary and junior high levels. The presence of individually integrated schools within the system is not evidence that the system itself is unitary. The court is satisfied that the separation of the races in the lower level schools is such that a charge of segregation is properly brought. Whether the segregation there existing is such that relief is warranted depends largely on whether it is a vestige of state imposed racial separation or whether it is de facto in nature. In determining the legal standards to be applied in resolving this question the court must rely primarily on the Supreme Court's most recent decision, Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and those cases following it decided by the United States Court of Appeals for the Sixth Circuit.

 The Swann decision attempts to set out guidelines to be followed in school desegregation litigations. Although the multiplicity of factors to be considered in these suits is such that it is impracticable to adopt rigid standards, the following language taken from the Swann decision seems to, in this

court's opinion, illuminate the essence of the Supreme Court's teachings which the lower courts must consider:

"In Green, [Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716] we pointed out that existing policy and practice with regard to faculty, staff, transportation, extracurricular activities, and facilities were among the most important indicia of a segregated system. 391 U.S., at 435, 88 S.Ct. [1689] at 1692. Independent of student assignment, where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a prima facie case of violation of substantive constitutional rights under the Equal Protection Clause, is shown.

\* \* \* \* \* \*

". . . In addition to the classic pattern of building schools specifically intended for Negro or white students, school authorities have sometimes, since Brown, closed schools which appeared likely to become racially mixed through changes in neighborhood residential patterns. This was sometimes accompanied by building new schools in the areas of white suburban expansion farthest from Negro population centers in order to maintain the separation of the races with a minimum departure from the formal principles of 'neighborhood zoning'. Such a policy does more than simply influence the short-run composition of the student body of a new school. It may well promote segregated residential patterns which, when combined with 'neighborhood zoning', further lock the school system into the mold of separation of the races. Upon a proper showing a district court may consider this in fashioning a remedy.

"In ascertaining the existence of legally imposed school segregation, the existence of a pattern of school construction and abandonment is thus a factor of great weight . . .

\* \* \* \* \* \*

"In light of the above, it should be clear that the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law. The district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation and will thus necessarily be concerned with the elimination of one-race schools. No per se rule can adequately embrace all the difficulties of reconciling the competing interests involved; *but in a system with a history of segregation the need for remedial criteria of sufficient specificity to assure a school authority's compliance with its constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition. Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominately of one race, they have the burden of showing that such school assignments are genuinely nondiscriminatory.* The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part.

"An optional majority-to-minority transfer provision has long been recognized as a useful part of every desegregation plan . . . .

\* \* \* \* \* \*

"Absent a constitutional violation there would be no basis for judicially ordering assignment of students on a racial basis. All things being equal, with no history of discrimination, it might well be desirable to assign pupils to schools nearest their homes. *But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation. The remedy for*

*such segregation may be administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school systems.*" (Emphasis added.)

The court understands this language to mean that: 1) the quality of schools and the placement of teachers may be considered apart from actual student assignment; and that 2) in a system that has a history of state imposed segregation, a neighborhood plan which tends to promote separation of the races is not a sanctity which must be preserved inviolate.

The Sixth Circuit Court of Appeals construed the Swann decision in Goss v. Board of Education of City of Knoxville, Tennessee, 444 F.2d 632 (1971), to mean that the continuance of all black or all white schools cannot be justified solely by accident or circumstance of neighborhoods. The Court said:

"It is clear . . . that . . . some white children must be moved out of the schools of their families' long time neighborhood, solely because they are white. Likewise, it may be that some Negro children will be compelled to give up attendance at a school in which they would prefer to remain.

"It would appear, therefore, that some disparate treatment in favor of racial minorities must be tolerated until the 'vestiges' of de jure segregation have been eliminated.

"While the existence of some all black or all white schools is not struck down as per se intolerable, school authorities will have to justify their continuance by something more than the accident or circumstance of neighborhood."

The Court went on to note that its decision in Deal v. Cincinnati Board of Education, 6 Cir., 369 F.2d 55 (1966), was, in light of Swann, no longer viable. In Deal it was held that the School Board could not be responsible for factors outside of the schools which deprived children of some of the existing choices; that the fact that racial imbalance existed did not warrant relief; and that relief was only proper where there was an arbitrary denial of freedom of choice.

■ In the case at bar it does not appear, as the court has noted, that the Board has imposed a discriminatory plan of teacher assignment. However, as the court has also previously noted, it appears that the quality of the facilities of the schools which the plaintiffs have challenged is significantly below that of the surrounding predominantly white schools. Although this may be corrected in the very near future, for the purposes of this case what may occur within the next several school years is not controlling. The fact that the School Board has refurbished and built new schools which serve the white children of the community, while it has tolerated substandard facilities for several of the schools which serve the majority of black students must be viewed as a vestige of state imposed segregation.

■ The defendants vigorously argue that the predominantly black elementary and junior high schools have resulted from existing or evolving neighborhood patterns over which it has no direct control. Certainly the Board cannot be held responsible for the existence of homogeneous black residential areas, but the duty of the Board under Swann and Goss compels it to take steps which in the words of Chief Justice Burger may be "awkward, inconvenient" or "bizarre" in order to eliminate as fully as possible school segregation caused by neighborhood patterns.

■■ The Board has not technically denied a child's freedom of choice, but it has permitted a degree of duality within the system which could be eliminated. Under Swann this racial imbalance is a vestige of state imposed segregation which is unconstitutional under the Fourteenth Amendment. The burden on

the School Board under Swann and Goss is far more onerous than that set out by the Sixth Circuit in Deal. The burden upon the School Board entails more than a simple technical compliance with the Equal Protection of Law Clause as it relates to school desegregation. The onus is not properly borne unless a functional compliance—meaningful integration—is achieved. The Sixth Circuit Court of Appeals, in its latest desegregation decision, Kelley v. Metropolitan County Board of Education, 463 F.2d 732, 743 (1972), declared that:

> "Where a school system has been deliberately constructed on a segregated basis by state action, a duty inheres in the School Board to do more than to establish rules fair on their face which simply serve to perpetuate the effects of such segregation."

The court is not persuaded that natural neighborhood boundaries, or the need for special enrichment programs would prevent the redrawing of zones to achieve a better racial balance in the elementary and junior high schools. Furthermore the existence of a majority to minority transfer plan, despite its value, does not justify the racial separation within the elementary and junior high systems. A majority to minority transfer provision is a useful tool, but is not a substitute for more affirmative action.

It must be emphasized that the defendant Board has achieved a substantial degree of integration in many of the schools within Fayette County. The school system in this case, unlike those in many of the cases now pending in federal courts throughout the country, should not require major alterations. It is quite possible that the remodeling and construction program having been recently commenced and the rezoning which will follow therefrom will properly rid the system of the existing racial imbalances. However, the situation now is such that the court is compelled to grant judgment in favor of the plaintiffs. The education of small children cannot be held in abeyance until im-

provements are made. If the state undertakes to provide elementary and junior high schooling it has an obligation to make available to all children without regard to race or place of residence, the best possible educational facilities that can be offered. If state supported integration is to succeed in softening racial prejudices, its success is dependent upon its implementation at the lowest possible levels.

This court, as did the Supreme Court in Swann, realizes the many "intractable" and "flinty" problems that occur in the "day to day implementation" of school desegregation, however, those are problems that must be met by the Board. In the second Brown decision, Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), the Supreme Court squarely placed the burden of school desegregation on the School Board. Again in Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and Alexander v. Holmes Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969), the Supreme Court reemphasized the burden of the School Board in dismantling dual school systems and the need for immediate implementation of unitary school facilities.

The court is satisfied that the Board, despite its apparent good faith, has by its actions or inactions tolerated a substantial separation of the races at the lower school levels which is not constitutionally permissible.

An order will this day be entered declaring the operation of the Fayette County School System to be in violation of the Equal Protection Clause of the Constitution, and directing the defendant to conform to that clause as it has been interpreted by the Supreme Court, by eliminating all vestiges of segregation within elementary and junior high schools. The court does not feel that it is within its province to provide a desegregation plan, but will suggest that ideally no elementary or junior high school should have below 15% or above 30% enrollment of black students.