**Ronald B. JOSLIN, et al., Plaintiffs,**

v.

**BOARD OF EDUCATION OF FAYETTE COUNTY, KENTUCKY, et al., Defendants.**

**Civ. A. No. 83-79.**

United States District Court, E.D. Kentucky, Lexington Division.

July 22, 1983.

John R. Leathers, Lexington, Ky., for plaintiffs.

William E. Sloan, Wylie and Sloan, Lexington, Ky., for defendants.

MEMORANDUM OPINION

WILHOIT, District Judge.

This civil action seeks injunctive relief to a redistricting plan implemented by the Fa-

yette County Board of Education on or about March 21, 1983. The plaintiffs are parents of *white* students heretofore attending Morton Junior High School (hereinafter referred to as *Morton Jr.*) and they attacked the new plan that deals with only the realignment of two junior high school districts. The plaintiffs' children have been designated to attend Lexington Junior High School (hereinafter referred to as *Lexington Jr.*) during the 1983–1984 school year. The redistricting was occasioned by overcrowded conditions at *Morton Jr.* and the under-utilization of space at *Lexington Jr.*

The Fayette County Board of Education is a consolidation of all public schools within Fayette County, Kentucky, including schools formerly operated by the City of Lexington Independent School District. *Lexington Jr.* is situated in the downtown area of Lexington and is within the shadow of the United States Courthouse while *Morton Jr.* is southeast of the downtown area and would be approximately half-way between downtown and the New Circle Road. The plaintiffs all reside in a rather compact area situated outside the perimeter of New Circle Road and complain bitterly about their children being essentially bused past *Morton Jr.* into downtown Lexington to a school that, according to plaintiffs, would be the fifth closest school to their place of residence.

The complaint seeks to have the action of the Board set aside or, alternatively, a finding that the schools in Fayette County were never integrated, or at least that they are now segregated and an order for a new and comprehensive county-wide desegregation plan.

The complaint alleges:

(1) That the students were selected, in whole or in part, because of their race;

(2) That the students would be bused a greater distance from their homes resulting in an adverse effect on their health, safety, and educational development;

(3) That the academic curriculum and extracurricular activities available to children attending *Lexington Jr.* is not equivalent to that available to the students at *Morton Jr.;*

(4) That there were other plans for redistricting that would have been less disruptive and, consequently, there was and is a need for a more comprehensive redistricting plan for all schools within the system, elementary, junior high, and high school; and

(5) That the foregoing constituted vestiges of a dual, segregated school system that deprived the children of an equal educational opportunity in violation of 20 U.S.C. § 1703(b) and the fourteenth amendment to the United States Constitution.

Subsequent to the filing of the original complaint the plaintiffs filed an amended complaint setting up a civil rights claim under 42 U.S.C. § 1983.

On the day this complaint was filed, plaintiffs filed motions in the case of *Robert Jefferson, et al. v. Board of Education of Fayette Co., et al.*, Civil Action No. 2309, seeking to reopen and intervene. This suit was a prior claim that the Fayette Board was operating a dual and segregated school system. The attorney for the plaintiffs that practiced *Jefferson*[1] filed a written response objecting to the motions[2] and they were subsequently abandoned by plaintiffs prior to the hearing held in this matter.

In the *Jefferson* case, parents of certain black students attending elementary and junior high schools initiated the action com-

---

1. Robert A. Sedler, Wayne State Univ. Law School and a former professor at the College of Law, Univ. of Ky.

2. The basis for the objection was that *Jefferson* had terminated when the mandate issued from the Sixth Circuit and it was argued that this Court no longer had jurisdiction in the case and that the Fayette Board was not required by

Judge Swinford's Order to do further redistricting for the 1983–84 school year. It was further argued that the school district was permitted to assign students on a racial basis, but was not constitutionally required to do so and was not required to do so under the terms of Judge Swinford's Order.

plaining that the Board had not implemented a plan to completely desegregate the public schools. The record reflects through statistics filed in the case that there were racially identifiable schools existing in Fayette County for the 1971–1972 school year. Moreover, evidence indicated that many that could be identified as *black schools* were in poor physical repair and condition.

On June 13, 1972, Hon. Mac Swinford rendered and entered his opinion in the case declaring that operation of the school system was found to be in violation of the equal protection clause of the fourteenth amendment of the United States Constitution. *Jefferson v. Board of Education of Fayette County, Ky.*, 344 F.Supp. 688 (E.D. Ky.1972).

It is important at this point to note the conclusion of Judge Swinford's opinion where he said:

> The Court does not feel that it is within its province to provide a desegregation plan, but would *suggest* that ideally *no elementary or junior high school should have below 15% or above 30% enrollment of black students.* *Id.* at 693. (emphasis added).

In compliance with Judge Swinford's Order the Fayette County Board of Education submitted a desegregation plan for the entire system. The plan for the junior high schools contained the ratios for each of the schools during the 1971–72 school year, which were found to constitute a dual system, and for the succeeding school year of 1972–73, which the Board submitted as being in compliance with the Court's Order. These ratios were as follows:

| Schools | 1971–1972 % Blacks | Projections: 1972–73 % Blacks |
|---|---|---|
| Beaumont | 2.6 | 5.1 |
| Bryan Station | 11.3 | 19.8 |
| Crawford | 4.3 | 18.1 |
| Dunbar | 87.0 | Closed |
| Clark | 0.0 | 0.0 |
| Leestown | 31.2 | 31.2 |
| Lexington | 78.5 | 28.3 |
| Morton | 20.2 | 25.6 |
| Southern | 1.2 | 8.1 |
| Tates Creek | 2.1 | 13.3 |
| Winburn | 32.5 | 32.5 |

The Board reported to the Court that the implementation of the above plan required reassignment of 1,202 junior high school students of whom 520 were white and 682 were black. The plan was submitted to the Court on July 14, 1972.

Judge Swinford held an oral hearing on July 31, 1972, to inquire into the constitutional sufficiency of the plan. This procedure was appealed to the Sixth Circuit Court of Appeals and on September 28, 1972, the case was remanded for the purpose of holding an *evidentiary* hearing as to the plan's legality. A hearing was held on November 6–9, 1972, resulting in a finding by the Court that the submitted plan complied with the Court's previous Orders to desegregate the schools.

In the Conclusions of Law, Judge Swinford relied heavily upon *Swann v. Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and observed that only when school authorities *failed* to submit a plan would the Court implement a plan of its own. Where the Fayette Board undertook to proffer a desegregation plan, he held that the Court's sole obligation was to test its constitutionality and *"is not at liberty to substitute its judgment for that of the Board."*

Of primary concern is the Finding and Conclusion that the Board had permitted identifiably black schools to operate which were in inferior physical condition as being a vestige (a lingering footprint) of a dual and racially segregated school system:

> Perhaps the School Board's most indefensible wrong in this action was not its discriminatory separation of races—although that was indeed wrong and clearly unconstitutional—but its tacit endorsement of the education of black students in substandard facilities.

Finally, the Court concluded:

> (4) It is the final Conclusion of the Court that the defendant's plan provides a *unitary* school system for the elementary and junior high schools of Fayette

County. As the Court has found, eight of the schools within the elementary and junior high school systems were not wholly integrated, however, the Court also found that the location of those schools presented genuine problems which justified their current racial composition. Certainly balanced integration throughout all of the schools would be favored, but where there are real logistical problems and inconveniences the law does not require it. In the Sixth Circuit Court of Appeal's most recent school desegregation decision, *Mapp v. Board of Education*, [477] F.2d [851] 1972, it was made very clear that the law does not demand inflexible racial quotas. The opinion of the Court included this language:

"We do not read *Swann* and related cases as requiring a fixed racial balance or quota in each and every school in a city, irrespective of the residential patterns of the city."

\*       \*       \*       \*       \*       \*

"The difficulty is that the District Court may well have understood the words ('school authorities should make every effort to achieve the greatest possible degree of actual desegregation taking into account the practicalities of the situation') to require integration of the races by fixed numbers or quotas in each public school in the system, regardless of where the pupils live, and regardless of their economic circumstances. We do not believe the law requires any such thing." ....

The Court is satisfied that the Board's plan is constitutional, provides a unitary school system, and should be approved as was done by order of the Court on July 31, 1972.

This order was appealed to the Sixth Circuit Court of Appeals, and the plan as approved was affirmed on October 25, 1973, without a published opinion. *Jefferson v. Board of Education of Fayette County, Ky.*, 486 F.2d 1405 (6th Cir.1973).

The plaintiffs assert that the defendant Board has failed to adhere to Judge Swinford's "suggested" 15%–30% range of racial ratios for the elementary and junior high schools operating within the Fayette County schools. It is alleged that this failure has resulted in the operation of a dual and segregated system.

These allegations present a novel question because, as previously indicated, the plaintiffs are parents of *white* junior high school students.

Actually it would appear that the junior high schools are no more segregated now, except Winburn and Morton, than under the 1972 plan. Below are the percentages of black students projected for each of the schools in 1972 plan as compared to the 1982 ratios and the changes that will be reflected during the coming year:

| Schools | 1972 Plan | 1982 Ratios | 1983–84 |
|---|---|---|---|
| Beaumont Jr. | 5.1 | 12.3 | |
| Bryan Station Jr. | 19.8 | 15.6 | |
| Crawford Jr. | 18.1 | 17.7 | |
| Clark Jr. | 0.0 | 1.2 | |
| Leestown Jr. | 31.2 | 27.8 | |
| Lexington Jr. | 28.3 | 33 | 27.1 |
| Morton Jr. | 25.6 | 10.2 | 12.3 |
| Southern Jr. | 8.1 | 7.9 | |
| Tates Creek Jr. | 13.3 | 16.0 | |
| Winburn Jr. | 32.5 | 49.9 | |

It is readily apparent that the plan Judge Swinford approved contemplated that in 1972–73, two of the ten junior high schools would be in excess of the 30% guideline, Leestown and Winburn, while four schools, Beaumont, Clark, Southern and Tates Creek would operate under the 15% guideline, or on the low side.

In 1982 there were six schools outside the 15%–30% guidelines. Lexington and Winburn were over 30% black while Beaumont, Clark, Morton and Southern are below the 15% guideline. In 1983–84, *Lexington* moves within the guidelines and *Morton* moves closer to 15%.

The Court further finds that the variances in racial ratios were due to demographic changes, and that there was a complete lack of evidence pointing to any deliberate official act of the defendant Board to resegregate the schools. Quite to the contrary, the defendant officials appeared to

the Court to be quite sensitive in avoiding such a result.

Laying aside the question of standing altogether, it appears that in 1972, this Court declined to strictly adhere to the 15%–30% suggested guidelines. More recently the Sixth Circuit observed in *Cunningham v. Grayson*, 541 F.2d 538, 542 (6th Cir.1976):

> Had the district judge imposed "inflexible" racial ratios in the desegregation plan, such imposition would have been an abuse of his discretion. But we agree with plaintiffs and LBE that the district judge permissibly used the system, racial composition as "a starting point in the process of shaping remedy." (citations omitted)

In *Jefferson*, Judge Swinford not only lashed out at the separation of the races in the schools, but decried the fact that the identifiably black schools were in varying degrees of disrepair while the predominantly white schools were superior in their physical appearance. This was found to have been one of the vestiges of a dual system that was most harmful.

Plaintiffs have argued that this Court should not give undue deference to the 1972 plan and Judge Swinford's opinion approving it as carrying out the mandate of *Brown v. Bd. of Education (Brown I)*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) and *Swann, supra.*

But in a very real sense this Court cannot escape certain immutable facts. The 1972 desegregation plan that Judge Swinford approved was later scrutinized by the Sixth Circuit Court of Appeals. And in the following decade there have been no dramatic changes. Moreover, the black plaintiffs in *Jefferson* opposed plaintiffs' efforts to reopen their case and the black community has not sought to intervene in this civil action although the door was certainly open to them during the course of these proceedings.

This Court does not hold that white children can *never* attack a school system for race identification. *See Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Instead, this Court believes that the posture of this case prevents delving into this subject altogether. This is evident in comparing this case to *Brown I, supra.*

*Brown I* was tried on sociological grounds, focusing on the psychological effects of segregation upon black children.[3] The instant case, however, was tried solely on the question of whether it was reasonable for the Board to choose to transfer these particular children, rather than other *white* children living closer to *Lexington Jr.* Therefore, many of the core issues presented by *Brown I*, need not even surface here.

During the pre-trial process it appeared to the Court that this case might well turn on an allegation that the reassignment of plaintiffs' children would deprive them of an equal educational opportunity. The complaint was made that courses available to them at *Morton* would not be available at *Lexington.* The parents were fearful that courses might be *offered* at *Lexington* but not *taught* if there appeared to be a lack of student interest. Complaint was also made that extra-curricular activities would not be equivalent at *Lexington Jr.*

Prior to the hearing, however, these issues were defused with a stipulation that has been filed in the record, and the Court is now confident in the belief that no student attending *Lexington Jr.* will be deprived of an opportunity to follow any course of study simply because there would not be enough students to make it practical to teach the course at *Lexington.* The Board has agreed that in such instances a student would be permitted to transfer. Suitable arrangements were also made to

---

**3.** *Brown I* stated in part:

"To separate them (black children) from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Id.* 347 U.S. at 494 and n. 11, 74 S.Ct. at 691 and n. 11.

alleviate the fears relative to the extracurricular activities.

There were interrogatories filed in the action which made an oblique reference to other disparities in a student's educational experience at *Lexington Jr.* The racial ratio of the faculty in both the schools appear to be the same. The ratio of teachers holding post-graduate degrees to students would be approximately the same. An informal visit by the Court to both schools revealed that the physical plants were at least equal, and in some respects *Lexington Jr.* was superior. Affidavits of parents filed in support of the motion for preliminary injunction indicated that the complaint was going to be that their children would receive an inferior education at *Lexington Jr.* This claim was not borne out either by pretrial discovery or by evidence produced at the hearing.[4]

The plaintiffs argue that even if the statistics pointed to a unitary and integrated school system, the fact is that *race* was a factor, or the basis upon which they were chosen, and that fact alone is evidence that the system is indeed dual and segregated. This argument places the defendant Board on the horns of a dilemma. If, since 1972, the Board had disregarded race entirely in redrawing districts and making student assignments and the schools had become re-segregated, then the minority students would have attacked the system as being dual and segregated, *Jefferson* notwithstanding. On the other hand, if race is to be considered as a factor, as was done in this case, these plaintiffs, or for that matter, white children in any of the other options would have been seeking out *their* day in Court.

If race is never to be considered, at any time, then the system may well become racially segregated once again. While it is true that under *Swann* the Board is not required to make year-by-year adjustments of racial ratios of student bodies after having achieved a unitary status, the Board

cannot thereafter ignore these ratios. The doctrine of "once in grace—always in grace" is inapplicable in this instance. *U.S. v. Texas Ed. Agcy.*, 647 F.2d 504 (5th Cir.1981).

Finally, plaintiffs argue that the selection of their children was an arbitrary and capricious decision in violation of state law and the equal protection clause of the fourteenth amendment of the United States Constitution.

The Kentucky Revised Statutes permit a board of education the right to create the attendance districts within a school system. These statutes further provide for the transportation of students when they live beyond a reasonable walking distance from the nearest school within their district. K.R.S. 158.110 provides:

(1) Boards of education may provide transportation from their general funds or otherwise for any pupil of any grade to the nearest school to said pupil's residence within the district who does not live within a reasonable walking distance to such nearest school of appropriate grade level.

(2) When space is not available at the nearest school, boards of education may provide transportation from their general funds or otherwise for any pupil of any grade who does not live within a reasonable walking distance to the nearest school of appropriate grade level where space is available.

Similarly K.R.S. 159.070 provides:

Within the appropriate school district attendance area, parents or legal guardians shall be permitted to enroll for attendance their children in the public school nearest their home.

But the last quoted statute, as applied in Jefferson County, Kentucky, was declared unconstitutional because it conflicted with a Court ordered desegregation plan. *Newburg Area Council, Inc. v. The Board of Education of Jefferson Co.*, 583 F.2d 827

---

**4.** Copies of newspaper articles filed in the record indicate that the parents argued to school officials that the neighborhood surrounding *Lexington Jr.* was dangerous, and presented a threat to their children. However, this was not pursued at the trial of the case.

(6th Cir.1978). The decision to realign the *Morton Jr.* and the *Lexington Jr.* school districts was justified for the reason that *Morton Jr.* was obviously overcrowded and *Lexington Jr.* was not being utilized to its utmost. There was convincing evidence that a shift of 150 or more students would have to occur between these districts to achieve this balance. The districts are contiguous. The total student population of the junior high schools in Fayette County are, according to the proof, at or near full capacity, county-wide.

The testimony of the witnesses and the exhibits filed in this action revealed:

| Schools | Bldg. Capacity | "Projected" 1983–84 Students | Over Capacity | Under Capacity |
|---|---|---|---|---|
| Beaumont Jr. | 790 | 794 | 4 | |
| Bryan St. Jr. | 680 | 658 | | 22 |
| Crawford Jr. | 780 | 738 | | 42 |
| Clark Jr. | 730 | 789 | 59 | |
| Leestown Jr. | 710 | 656 | | 54 |
| Lexington Jr. | 740 | 544 | | 196 |
| Morton Jr. | 710 | 878 | 166 | |
| Southern Jr. | 820 | 851 | 31 | |
| Tates Cr. Jr. | 800 | 846 | 46 | |
| Winburn Jr. | 840 | 809 | ___ | 31 |
| Totals: | 7,600 | 7,561 | 306 | 345 |

While *Lexington Jr.* and *Morton Jr.* are contiguous, the three remaining schools significantly at over-capacity, Clark, Southern and Tates Creek are situated on the south side of town between the Harrodsburg Pike and Tates Creek Pike. The four schools (aside from *Lexington Jr.*) at under-capacity are situated on the north side of town and are not contiguous to the schools first mentioned.

There were four options drawn by the staff to present to the Board as alternative measures for relieving the overcrowding at *Morton Jr.*

Option I involved the transfer of 319 pupils. This would have involved the reassignment of plaintiffs children to Crawford Jr. and then, in turn, other pupils from Crawford would then be transferred to *Lexington Jr.*

Option II involved the reassignment of plaintiffs' children in *Morton Jr.'s* district to the *Lexington Jr.* district. This option was the one that was finally decided upon. This area is the farthest from *Lexington*

*Jr.*, and is outside the New Circle Road perimeter.[5]

Option III involved the transfer of 141 pupils from an area around the University of Kentucky, which included a number of black students; and, had negative effect on racial ratios.

Option IV would have involved the transfer of white students west of Woodlawn Avenue and again those around the University of Kentucky, including those in the area set-out in Option III, except that black students would have remained at *Morton Jr.* This area was not only contiguous to the *Lexington Jr.* district, but was the closest in proximity to it. This Option was rejected for the reason that only 94 white students lived within the area, and that this number was deemed insufficient.

There was another option but this option was not reduced to writing. It involved the area just inside of the New Circle Road and would be closer in distance to *Lexington Jr.* than would the plaintiffs area set-out in

5. The New Circle Road completely encircles the City of Lexington and has, until recent times, been the hedgerow between Town and Country.

Option II. This option was referred to in the evidence as Option "X".

To be sure, there were public meetings held by the Board at which public comment was invited and received. It appears that only Option II was presented at the open meetings. The cynical observers suggested that the decision was made in private consultations between the staff and individual board members prior to the public meetings. Also, it was suggested that Option "X", so-called, did not see the light-of-day when it appeared that this area was the place of residence of one of the Board members and the Superintendent. This was only a suggestion. There was no direct evidence of any overt actions, and Option "X" was explained away.

Without unduly burdening this opinion, suffice it to say that the defendants presented many reasons for the acceptance of Option II and the rejection of Option I, III, IV, and "X", so-called. It was admitted that among the criteria, race was considered. The time and cost of transporting the pupils was also considered. In this regard there was a total lack of proof that the additional time and distance traveled by plaintiffs children on the school buses would have affected their health or safety. It was simply a matter of a few additional minutes.

An additional criterion was the "feeder school" consideration. This was of questionable weight insofar as 32 elementary schools feed but 10 junior high schools which, in turn, feed but 4 senior high schools in the county. Yet, the defendants claim that it was a factor that was taken into account. So much grist for the mill.

By simply looking at a map of Lexington, plaintiffs have a compelling argument. At first blush it is difficult to see that there could be any good reason for the Board to have preferred Option II. This is precisely the plaintiffs claim—that the decision was arbitrary and capricious.

Such acts have been characterized as "actions taken by an administrative agency or inferior Courts meaning willful and unreasonable action without consideration or in disregard of facts or without determining principle." *Black's Law Dictionary* 96 (5th ed. 1979). Charges of arbitrary and capricious actions by school boards are not uncommon in this jurisdiction. In *Snapp v. Deskins,* 450 S.W.2d 246 (Ky.1970) the Kentucky Court of Appeals described an arbitrary act as being "in the sense of being contrary to democratic ideals, customs and maxims; essentially unjust and unequal; exceeding the reasonable and legitimate interest of the public; not in the court with reason." *Id.* at 251. The Court went on to say that arbitrariness would be inferred where there was evidence of a bitter political conflict. But in *Snapp* we see that the board was unable to give much in the way of justification for the transfer of certain teachers.

In *Stevens v. Hunt,* 646 F.2d 1168 (6th Cir.1981), our closest court of appellate review had occasion to observe:

> In order to establish such arbitrary and capricious action, the plaintiffs must show that there is no rational basis for the University's decision, ... or that the decision to dismiss was motivated by bad faith or ill will unrelated to academic performance. *Id.* at 1170.

The Court cannot finally conclude that Option II was the "superior" plan as was claimed by the Board. On the other hand the Court cannot conclude that the failure of the Board to exercise "better judgment" as claimed by the plaintiffs can be characterized as *arbitrary* or *capricious* in this particular instance.

When looking at a map of Lexington, one notices that the school districts are roughly pie-shaped. There are children in every district transported to a school farther from home than the school in the adjacent district. In fact, there are children living in the shadow of *Lexington Jr.'s* bell tower who are transported farther from their residence than is *Lexington, Jr.*

If this Court were to grant the relief requested, *i.e.,* compel the Board to transport plaintiffs' children to the nearest school (where space is available), other chil-

dren, similarly situated, would seek the same relief. As a result, the schools would become resegregated due to changes in housing patterns. This Court cannot permit this to happen.

While the Court may well have voted for a plan other than Option II had he been a Board member in March 1983, it cannot find that the Board's decision was without any good reason or rationalization. There was no evidence whatsoever that the action of the Board was in retaliation for plaintiffs' prior speech or political activity in Board politics. While the Court has great understanding for the feelings of these parents, the decision of the Fayette County Board of Education was a "policy call" and this Court should refrain from imposing a judicial solution to a problem that will have to be resolved at the next public election.

Accordingly, it is the opinion of the Court that the relief prayed for be DENIED, and the complaint, as amended, should therefore be DISMISSED. The defendant is directed to submit appropriate Findings of Fact and Conclusions of Law consistent with this opinion and judgment shall enter thereon.